Kenneth E. LYMAN, Plaintiff,

v.

David L. LADD, Commissioner of
Patents, Defendant.

Civ. A. No. 1059-63.

United States District Court
District of Columbia.

Aug. 4, 1964.

N. D. Parker, Jr., Washington, D. C.,
Edwin S. Booth, Bair, Freeman & Moli-
nare, Chicago, Ill., for plaintiff.

Clarence W. Moore, Sol. U. S. Patent
Office, Washington, D. C., for defendant.

JACKSON, District Judge.

This civil action was brought pursuant
to 35 U.S.C. § 145 seeking judgment of
this Court authorizing the defendant,
Commissioner of Patents, to issue Letters
Patent of the United States containing
claims 1 through 7 of an application
Serial No. 844,408 entitled "Automotive
Independent Wheel Suspension System",
filed October 5, 1959, by the plaintiff.

The invention described in the applica-
tion relates to an automotive independent
wheel suspension system in which the
wheel is connected to the frame of the
vehicle for vertical movement by a trans-
verse parallelogram linkage pivotally con-
nected at one end to the wheel and at the
other end to the frame of the vehicle.
The chassis is supported on the wheels
by a cantilever spring fixed to the frame
with the end of the spring acting on the
linkage. A front wheel is pivotally con-
nected to the parallelogram linkage by a
yoke having spaced vertical king pins
supporting the wheel for turning move-
ments about an axis lying in the central
plane of the wheel to steer the vehicle.
The usual shock absorber is eliminated,
and greater tire contact with uneven road
surfaces is achieved, by mathematical
apportionment of the parallelogram link-
age relative to the spring. By such
mathematical apportionment, the rate of
downward movement of the wheel in
passing down a bump or into a depression
in the road is made equal to the rate of
downward movement of the spring.

The claims read as follows:

*"Claim 1:*

"In a vehicle suspension system
including a vehicle frame, a wheel,
linkage means connecting the wheel
to the frame for vertical movement
relative thereto and a spring acting
on the linkage means urging the
frame upward relative to the wheel,
the improvement comprising so con-
structing and proportioning the
spring that the frequency controlled
rate of downward movement of the
point therein which acts on the link-
age is equal to the gravity effected
rate of downward movement of the
point in the linkage acted on by the
spring.

*"Claim 2:*

"The suspension system of claim 1
in which the wheel is pivotally con-
nected to the linkage means for turn-
ing movement about a vertical axis
lying in the center plane of the wheel.

*"Claim 3:*

"The suspension system of claim 1
in which the time required for the
wheel to move from its highest to its
lowest position is equal to one-half of
the period of vibration of the spring.

*"Claim 4:*

"In a vehicle suspension system including a vehicle frame, a wheel, a generally horizontal linkage privoted at one end to the frame and at the other end to the wheel to support the frame on the wheel, and a spring acting on the linkage and urging the frame upward relative to the wheel, the improvement which comprises so constructing and relating the linkage to the spring as to provide a natural timed downward movement of the linkage about its pivotal connection to the vehicle frame when the wheel moves downward equal to the natural period of movement of the spring whereby there is no resultant transfer of energy between the spring and the linkage when the wheel moves downward relative to the frame.

*"Claim 5:*

"The spring suspension of claim 4 in which the spring is a cantilever spring with one end secured to the frame and the other end secured to the linkage to the wheel.

*"Claim 6:*

"The spring suspension of claim 4 in which the wheel is supported for turning movement about a vertical axis lying in its center plane and carried by a yoke to which the linkage is pivoted.

*"Claim 7:*

"The spring suspension of claim 6 in which the linkage is a parallelogram linkage supporting the wheel for parallel movement."

The Examiner in the Patent Office rejected all the claims as unpatentable, stating that they contained subject matter which, as a whole, would have been obvious at the time the invention was made to a person ordinarily skilled in the art. 35 U.S.C. § 103. In order to demonstrate this obviousness, the Examiner relied upon a United States patent to Metz, No. 2,202,665, a United States patent to Siebler, No. 2,122,961, and a printed publication entitled "Vibration of Rail and Road Vehicles" by B. S. Cain, pp. 84 to 86 (1940).

The patent to Metz discloses an independent front wheel suspension system in which a wheel is supported by a yoke on spaced vertical king pins for turning movement, and is connected to the frame for vertical movement by a transverse parallelogram linkage pivotally connected at one end to the yoke and at the other end to the frame. A radius arm is also provided, and extends rearwardly from the yoke to a pivot point on the frame. The chassis is supported on the wheels by a transverse, semi-elliptical spring having an end acting on the parallelogram linkage and the center portion attached to the frame. The vertical axis of the king pins is stated to be practically centered in the central plane of the wheel, being offset inwardly by about ¼ of an inch. The need for a shock absorber is eliminated, and greater tire contact with uneven road surfaces is achieved by a "synchronous balance of operative reaction forces." Metz attributes this balancing of reaction forces to the proportioning of the linkage and radius arm to establish frequencies of functioning of the wheel mass equivalent to the established frequency of the spring. The inner end of the lower parallelogram linkage arm is provided with a shock absorber effective at low speeds and decreasingly effective as speed increases. At speeds in excess of 25 m. p. h., it was found that no undamped forces of significant magnitude are felt.

The patent to Siebler discloses an independent front wheel suspension for automobiles in which the wheel is carried by a steering swivel connected to the frame by relatively wide upper and lower transverse links pivotally connected at one end to the swivel and at the other end to the frame. A transverse spring is fixed at one end to the frame and pivoted at the other end to the steering swivel. No radius arm is provided.

According to the plaintiff's brief and the testimony introduced by plaintiff at trial, the essence of his invention resides

in arranging the proportions of the suspension linkage and the spring so that no unbalanced forces will be produced between the spring and the linkage when the wheel moves in the downward direction as a result of passing over a depression in the road. The rate at which the mass of the wheel and suspension linkage move downward in response to a depression in the road can apparently be calculated when the dimensions of the linkage and other characteristics of the wheel mass and linkage are known. Similarly, the natural frequency of vibration of a cantilever spring can also be mathematically determined when the characteristics of the spring are known. When the time required by the wheel mass to move to a certain distance downward equals the time required for the spring, through its natural frequency, to move downward through the same distance, no unbalanced forces between the spring and the linkage are created. Thus, by using a mathematical equation in which the time for downward movement of the linkage is equated to the time for downward movement of the spring, the physical dimensions of the spring and linkage can be mutually calculated in terms of one another.

The Metz patent describes a suspension arrangement which is predicated upon these very same mathematical relationships. While the patent does not set forth equations, it does state that the result obtained is to eliminate unbalanced forces between a spring and a linkage due to the "synchronous balance of operative reaction forces" in a vehicle wheel suspension unit which is substantially identical to the plaintiff's. Metz attributes this "synchronous balance" to arranging the spring and linkage so the "frequencies of functioning" of the spring and linkage are equivalent at the point of attachment. It would seem to necessarily follow from the "synchro-

nous balance" described that at the point on the linkage acted upon by Metz's spring both the spring and the linkage have the same rate of downward movement. This latter equivalence of movement at such a point is the essence of the subject matter set forth in plaintiff's claims.

The plaintiff in his brief has made much of the fact that Metz does not provide mathematical equations for explaining his results. It appears to the Court, however, that even though Metz did not choose mathematics for describing what he had done, this should not detract from the fact that he clearly disclosed the concept of balancing reaction forces in a suspension system in a manner substantially identical to that of the plaintiff. In any event, it certainly cannot be said that the mathematical relationship would have been unobvious to a person ordinarily skilled in the art with the Metz patent to guide him.

The Court also finds that plaintiff's arrangement for supporting the wheel for turning movement about a vertical axis lying in the center plane of the wheel would have been obvious in view of the Metz patent. The patentee's axis for supporting the wheel for turning movement differs only insofar as it is off-set inwardly by $\frac{1}{4}$ of an inch from the vertical axis claimed by the plaintiff. The Court does not believe this is a patentable difference.

After reviewing the record in the Patent Office, weighing the evidence presented at trial, and studying the briefs submitted by the parties, it is the opinion of the Court that the totality of the evidence is such that the Court cannot say that the Patent Office has erred.

Accordingly, the Court finds for the defendant and against the plaintiff, and hereby dismisses the Complaint.

The above Opinion contains Findings of Fact and Conclusions of Law.